## OLSEN v. UNITED STATES SHIPPING CO

### (District Court, S. D. New York. March 12, 1912.)

1. SHIPPING (§ 49*)—CHARTERS—DEDUCTION FROM CHARTER HIRE—DELAY IN FITTING VESSEL.

A steamer was delivered to a time charterer at New Orleans, and was directed to proceed to Mobile to load a cargo of timber, and also to remove stanchions from the hold, so that the timber could be put in. When the vessel reached Mobile, the master refused to take out the stanchions until he cabled his owners, which required several days, when they were taken out. *Held*, that the charterer was entitled to deduct charter hire for the time of the delay, it being shown that it was customary to remove the stanchions for such cargoes, that it did not endanger the vessel, and that they could have been removed on the trip from New Orleans, without causing any delay.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 187–202; Dec. Dig. § 49.*

Deductions and offsets from charter hire of vessel, see note to Tweedie Trading Co. v. George D. Emery Co., 84 C. C. A. 254.]

2. SHIPPING (§ 54*)—CHARTER—LIABILITY FOR INJURY TO VESSEL IN LOADING.

A charterer is liable for injury caused to a vessel in loading a cargo of heavy timber in her hold.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. § 54.*]

3. SHIPPING (§ 53*)—CHARTER—IMPROPER LOADING—LIABILITY FOR CARGO JETTISONED.

A steamer was loaded by a time charterer in gulf ports with a cargo of timber for Scotland, including a deck load piled to a height of 15 feet aft and 17 feet forward. The master protested against the forward deck load on the ground that it rendered the vessel unstable and unseaworthy, but the charterer's agent insisted and had a survey made; the surveyors reporting that it could safely be taken. The underwriters also consenting and giving a certificate of seaworthiness, the master consented, but, after putting to sea, was compelled to jettison a part of the forward deck load to save the vessel. *Held* that, under the circumstances, the whole responsibility was that of the charterer who should

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

be charged with the entire loss, and also with the expense of unloading and restowing the deck cargo at an intermediate port, and that it was not entitled to a deduction from the charter hire for the time thereby lost, nor for loss of freight on the cargo jettisoned.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 214–218, 225; Dec. Dig. § 53.*]

In Admiralty. Suit by Andr. Olsen, as owner of the steamship Bergenhus, against the United States Shipping Company, and cross-libel. Decree for libelant, and cross-libel dismissed.

Haight, Sanford & Smith (Charles S. Haight and John W. Griffin, of counsel), for Andr. Olsen.

Burlingham, Montgomery & Beecher (Charles C. Burlingham, Roderick Terry, Jr., and Robinson Leech, of counsel), for United States Shipping Co.

HOLT, District Judge. This is a libel and cross-libel in admiralty. The original suit was brought by Andr. Olsen, owner of. the Norwegian steamship Bergenhus, against the United States Shipping Company, which chartered the steamship, to recover certain amounts alleged to be due for charter hire and certain amounts which the libelant was obliged to pay the consignees of the cargo by reason of a jettison of a portion of the cargo. The cross-libel is a suit for the loss of freight caused by the jettison. By the charter party, dated June 24, 1909, the steamship Bergenhus was chartered to the United States Shipping Company, to be delivered to the company at New Orleans for one, or an option of two, trips to Colon, or, at charterer's option, home direct or via Mediterranean without Colon voyage. The charter was the government form of time charter, by which it was agreed that the charterer should pay £1,100 per calendar month until the voyage ended at a European port. The steamer was duly delivered to the charterer at New Orleans. The captain was then notified to take the vessel to Mobile, Ala., and then to Gulfport, Miss., and take on a cargo of timber, to be taken to Aberdeen, Scotland, and was informed that it would be necessary to take out certain stanchions in the hold in order to permit the timber to be loaded. When the ship arrived at Mobile, none of the stanchions had been removed, and the captain declined to remove them without authority from the owner. The captain claims that the charterer's agent demanded that all the stanchions in the hold should be removed. The charterer's agent claims that he simply demanded the removal of such stanchions as are usually removed in carrying timber cargoes. The captain refused to remove any of the stanchions until he obtained authority from the owner. Three or four days were occupied in cabling. The necessary authority was given, and some of the stanchions were taken out. The charterer deducted from the charter hire certain amounts as damages for the delay caused, claiming that the stanchions which were ultimately removed should have been removed on the voyage from New Orleans to Mobile, so that the steamer would have been ready to take in cargo as soon as she reached Mobile. At Mobile a portion

of the cargo of oak timber was put in the hold so as to occupy about a third of the space, and the vessel then proceeded to Gulfport, where the rest of the cargo, consisting principally of square pine timber, was loaded. The hold was completely filled, and an additional amount of timber was loaded on deck aft and forward. The after portion of the deck cargo was securely lashed, but the cargo on the forward deck was not lashed when the steamer started. The steamer at starting was backed about 100 feet from the position where she had lain, in order to take up the stern anchors. In doing so, the stern struck the bank, with the result that she threw off a portion of the cargo on the forward deck, doing some damage to the steamer. The steamer then proceeded down the harbor to Ship Island, where the water was deep. The timber which had been thrown off was collected and rafted down to the steamer at Ship Island, but the captain, on consultation with his mate, decided that the steamer would be unseaworthy if the timber was put back on deck. He wrote to that effect to the charterer's agent, and directed the tug with the raft to return it to the city. Thereupon the charterer's agent came to the ship, and urged the captain to take the lumber again on board. A survey was had, and the surveyors certified that the lumber could be safely taken. The captain then, under protest, took the lumber on board, and received a certificate of seaworthiness from the local agent of the underwriters, and the steamer proceeded on her voyage. Her intention was to stop at Newport News to coal, and then proceed to Aberdeen. When the steamer started to sea, the deckload aft was about 15 feet high, and the deckload forward was about 17 feet high, and the steamer had a list to port of about 11 degrees. As she proceeded to sea, the list steadily increased until, about 24 hours after the steamer had sailed, the list had increased to about 24 degrees. The result was that the port rail was under water, and the water came up on deck to the hatch coamings on the port side. The captain called in consultation the mate, engineer, and other officers, and it was unanimously decided to be necessary to jettison a portion of the cargo in order to save the ship from capsizing. Thereupon a considerable portion of the lumber on the forward deck was thrown over, causing considerable damage to the vessel. The steamer then proceeded to Newport News, where she received temporary repairs, and where the timber was reloaded and restowed. The steamer then proceeded to Aberdeen.

In this suit, the owner claims to recover the following amounts:

(1) Amount deducted from charter hire for time alleged to have been lost at Mobile............................................. $  780 80
(2) Damage to steamer through careless loading of heavy timber    1,580 32
(3) Demurrage during repair of this damage.....................      894 40
(4) Surveyors' fees and other expenses at Mobile...............       26 38
(5) Deductions from charter hire for expenses at Gulfport caused by unloading and reloading portion of deck cargo, etc....    1,265 14
(6) Amount paid cargo owners for deck cargo jettisoned.........    2,867 94
(7) Expenses at Newport News in unloading and restowing deck cargo, surveys held, etc.......................................      925 81
(8) Amount deducted from charter hire for twelve days' detention at Newport News.............................................    2,078 00
(9) Charter hire deducted for alleged expense of average bond, etc., at Aberdeen.................................................      111 96

The cross-libel is brought to recover $777.33, freight lost by reason of nondelivery of the portion of the cargo jettisoned.

[1] 1. In my opinion the charterer is entitled to deduct a reasonable compensation for the time lost at Mobile before the stanchions were taken out. The captain was notified at New Orleans that the cargo was to consist of long heavy timber. The evidence satisfies me that it is customary, when such a cargo is carried in the hold, to remove a portion of the stanchions in order to enable the timber to be put in the hold. The captain claims that the charterer demanded that all the stanchions should be removed, but I think that the evidence establishes that their demand was that the stanchions usually taken out in the case of such shipments should be removed. The proof shows that their removal does not affect the stability of the ship, because, when the hold is fully loaded, it is customary to insert wedges on top of the timber, thus affording a similar support to the beams which the stanchions formerly supported. If the captain needed to communicate with his owners, he should have done so at New Orleans, but in my opinion there was no necessity of communicating with his owners. The captain should have acted on his own knowledge of the usual course of business. He could have taken out the stanchions on the voyage before reaching Mobile, so as to have been ready to load as soon as he got there, and I think that therefore the charterer is entitled to compensation for the time lost after the ship reached Mobile before the stanchions were taken out. The libelant claims that the amount deducted by the charterer, $780.80, is excessive. It will be necessary, on various grounds, to have a reference to a commissioner in this case, and the question what is the proper amount to allow for such deduction may be referred to the commissioner.

[2] 2. The libelant's claims to recover for damage to the steamer's bulwarks, tank top, hold ladders, and other hold fittings through the careless loading and discharge of heavy timber, and for demurrage during the repair of this damage, seem to me valid. The loading of heavy timber in the hold of a ship undoubtedly usually causes some damage, but whatever damage is so caused should be paid for by the charterer. The question whether the amounts of $1,580,32, claimed for such damage, and $894.40, claimed for such demurrage, are correct amounts may be passed on by the commissioner.

3. The libelant's claim to recover surveyors' fees at Mobile, and other expenses in connection with the removal of the stanchions, amounting to $26.38, is in my opinion invalid on the same grounds as those stated in regard to the claim for time lost at Mobile through the removal of the stanchions.

[3] 4. The libelant's claim for the amount deducted from charter hire for .expenses paid by the charterer at Gulfport for unloading and reloading portions of deck cargo at Gulfport, and items connected therewith, amounting in the whole to $1,265.14, depends, in my opinion, upon the question whether the owner or the charterer was in fault for the steamer's throwing off the timber on the forward deck when she started from Gulfport. I think that the captain was at fault in starting without lashing the timber on the forward deck, and

I think that the charterer was in fault for loading the timber there. The subsequent events showed that with all the timber on board the vessel was lacking in stability and was unseaworthy. The timber which was thrown off when the vessel started from Gulfport, of course, would not have been thrown off if it had not been put on. Having been put on, the fact that it was not properly lashed made it liable to fall off, but I think the instability of the steamer made it, when it struck the bank, also liable to throw off the deckload. Upon the whole, my conclusion is that whatever expense was caused by that portion of the cargo which was on the forward deck being thrown overboard should be divided between the owner and the charterer. But, after the lumber was overboard, I think that it should not have been collected and taken down to Ship Island, and put on board at Ship Island, and that the party responsible for doing that, and insisting upon its being loaded at Ship Island, was the charterer's agent, Corry. When the ship arrived at Ship Island, the captain and his mate concluded that the steamer was too tender to take any more lumber on board, and the captain ordered the tug which had brought down the raft of lumber to take it back, and wrote to Corry, declining to have the lumber replaced on board on the ground that it would make the ship unseaworthy. Corry, representing the charterer, however, insisted that it should be taken on board. He had a survey made, and the surveyors, in their survey, reported that it could be safely taken. Mr. Collins, a representative of the underwriters, who at first agreed with the captain that it would be dangerous to take the lumber again on board, afterwards changed his mind, and gave his certificate of seaworthiness. Under those circumstances, the captain permitted the lumber to be replaced on the forward deck as it had been originally at Gulfport. When the loading was finished, the steamer had a deckload 15 feet high aft and 17 feet high forward. She had a list to port of 11 degrees. From the time the steamer put to sea, the list steadily increased until about 24 hours after she sailed it had reached 24 degrees, and the steamer was in imminent danger of capsizing, and thereupon the captain jettisoned part of the cargo on the forward deck in order to save the ship and the rest of the cargo, and the lives of those on board. The weather was quiet. There was no cause for the vessel to have listed in such a manner except the fact that she had not sufficient stability when loaded with such a deck load. She was therefore not seaworthy when she started from Ship Island. Under these circumstances, I have felt much hesitation in determining whether the fault for the vessel's sailing from Ship Island in an unseaworthy condition should be imputed wholly to the charterer, or should be charged in part to the captain. Ordinarily a captain is in fault if he puts to sea in a ship which he knows is unseaworthy, but the circumstances here were peculiar. The charterer's agent was insisting that the steamer should take the full load which had been put on her at Gulfport. The charterer's agent obtained a report of surveyors that the ship could take the load, and a certificate of seaworthiness from the representative of the insurance companies. If the captain under those circumstances had refused to take the full amount of cargo insisted

upon by the charterer's agent; the owner would probably have been held liable for his refusal to do so, upon the evidence of the survey and of the surveyors' certificate, and the captain charged with cowardice and unwillingness to do his duty. I think, under all the circumstances of the case, the whole responsibility for the vessel's sailing from Ship Island in the unseaworthy condition in which she was should be charged against the charterer. The question whether the various items, amounting to $1,265.14, alleged by the charterer to have been paid, are correct may be passed on by the commissioner. If, in fact, less than $1,265.14 was expended by the charterer, the difference between that amount and $1,265.14 should be recovered by the libelant.

5. The amount due and paid to the cargo owners for the deck cargo jettisoned I think should be recovered in this case on the same ground. The steamer, when she sailed from Ship Island, was unseaworthy because she had on too heavy a deck cargo, and in my opinion the charterer was responsible for that condition. The owner, therefore, had no defense to the claim of the cargo owner to the portion of the deck cargo jettisoned. I do not think that the judgment recovered in England by the cargo owner against the libelant is technically conclusive upon the respondent. Notice of that suit was not given to the respondent until after the owner of the steamer had conceded his liability in that suit, but I think that the evidence in this case shows that the libelant had no defense to that claim. As against the respondent, the amount allowed should be the actual amount due the cargo owners, and if, by reason of the litigation, that amount was needlessly increased, the respondent should not be charged with such increase. The commissioner may pass upon the question whether the whole of the sum of $2,867.94, claimed by the libelant as the amount paid to the cargo owners, is properly chargeable against the respondent.

6. I think that the respondent is liable for the expenses at Newport News in unloading and restowing the deck cargo, and for the surveys held by the charterer at Newport News. The commissioner should pass upon the question whether the sums of $783.25 and $125, claimed by the libelant, are correct. There is not sufficient evidence in the case to pass upon the question whether the claim of $17.56 for insurance on the portion of the cargo dischargeable at Newport News is recoverable or not, and that question is referred to the commissioner.

7. I think that the charterer should not be allowed any deduction for the 12 days alleged to have been lost at Newport News. Whatever time was lost there in excess of the time which would have been regularly occupied in taking on coal for the voyage to Aberdeen is, I think, chargeable to the charterer for having insisted upon the steamer's being overloaded at Ship Island. The question whether the amount deducted, $2,078, is correct, may be passed on by the commissioner.

8. The evidence is not sufficient to determine whether the amount deducted for the alleged expense of average bond at Aberdeen, $111.-96, should be allowed, and that question is referred to the commissioner.

I think the cross-libel should be dismissed. The loss of freight on the part of the cargo jettisoned was due to the fault of the charterer in insisting on having too heavy a deckload put on the steamer.

A decree may be submitted in conformity with this opinion.